

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00030-CR

CARLOS HERNANDEZ APPELLANT

V.

THE STATE OF TEXAS STATE

----------

FROM COUNTY CRIMINAL COURT NO. 5 OF DENTON COUNTY

----------

## OPINION

----------

### Introduction

After the trial court denied his motion to suppress, Appellant Carlos Hernandez negotiated a plea bargain with the State and pled guilty to driving while intoxicated (DWI). He reserved his right to appeal the trial court's ruling on his motion to suppress and now contends that the trial court erred by concluding that his detention by police passed constitutional muster and that a lost reporter's

record is not necessary to resolve this appeal. Because we agree with this second point, we reverse.

## Background Facts and Procedural History

Patrolling by an otherwise empty strip mall parking lot sometime after 2:00 a.m., Flower Mound Police Officer James Wickham noticed a black BMW parked in the lot with its headlights on, left turn signal flashing, and driver's side door open. Initially concerned that the driver may have suffered an injury or needed help, Wickham pulled in just as the car was backing from the space where Wickham had first seen it.

No lights were on at any of the businesses in the parking lot and the area was generally poorly lit. Wickham shined a spotlight on the BMW's driver's side window. As soon as he did that, Appellant pulled the car forward and jerked it to a stop, which caused his head to slam against the steering wheel.

Wickham parked and exited his patrol car. He approached Appellant and asked him what he was doing. Wickham immediately noticed Appellant's red eyes and the odor of an alcoholic beverage emanating from the car. Wickham began a DWI investigation, which led to Appellant's arrest and charges for that offense.

Appellant filed a motion to suppress, challenging all evidence obtained as a result of the stop. At a hearing on Appellant's motion, the State stipulated that Wickham had arrested Appellant without a warrant, and the State called Wickham as its only witness. Appellant presented no evidence at this hearing.

2

The trial court denied Appellant's motion to suppress but granted his request for written findings of fact and conclusions of law.

The trial court concluded that Wickham's and Appellant's initial exchange was not a detention under the Fourth Amendment but rather a voluntary encounter during which Wickham formed reasonable suspicion to detain and investigate Appellant for DWI after observing signs that he was intoxicated. The trial court also concluded in the alternative that the stop was supported by either reasonable suspicion or under the community-caretaking exception.

Appellant moved for a rehearing on his motion to suppress, contesting the trial court's conclusions that the stop was either a voluntary encounter or based on reasonable suspicion, neither of which had been litigated during the first hearing. The trial court granted a second hearing, after which it again denied the motion to suppress and issued a second set of written findings of fact and conclusions of law.

In its second set of findings of fact and conclusions of law, the trial court omitted its conclusion that Appellant had been detained on reasonable suspicion and concluded that the exchange with Wickham had been either a voluntary encounter—and thus not a seizure under the Fourth Amendment—or that the community-caretaking exception applied.

Appellant reserved the right to appeal the trial court's ruling on his motion to suppress and negotiated a plea bargain with the State, under the terms of which he pled guilty to Class B misdemeanor DWI in exchange for 160 days in

jail, probated for eighteen months, and a $600 fine. Appellant timely filed a notice of appeal.

We soon learned of a problem with the reporter's record. The court reporter informed us that the notes of the second suppression hearing had been taken by a substitute reporter who had since retired and moved out of state, and that those notes were missing. We abated the appeal for the trial court to determine whether the record of the second hearing had been lost, and if so, whether the lost record is necessary to the resolution of the appeal, and also whether the parties could agree on a complete record. The trial court found that the reporter's notes had been lost or destroyed, that the parties could not agree on a complete record, and that the lost portion is unnecessary to the resolution of the appeal.[1]

**Points on Appeal**

In his first point, Appellant contends that the trial court should have granted his motion to suppress because Wickham did not have a warrant or a proper exception to the warrant requirement to approach and detain him in the parking lot. In his second point, he contends that the trial court erred by finding that the lost record of the second hearing is unnecessary to the resolution of this appeal.

---

[1]In a footnote in his brief, Appellant states that "the evidence . . . and transcript [of the second hearing] were lost by the State." There is nothing in the record, however, to support the claim that the State bears any responsibility for the lost reporter's record. In fact, the evidence adduced during the abatement hearing that is now before us in the record from that proceeding negates the assertion.

4

The State argues that Appellant forfeited the second point by not objecting to the findings of fact and conclusions of law in the trial court. But as we read Appellant's second point, he contends that the trial court erred by finding that the lost record is not necessary to the resolution of this appeal. This particular claim did not arise until after the trial court determined that the record was both lost and unnecessary to the appeal. Those determinations were not made until the end of the abatement hearing. The record of that hearing reflects that Appellant effectively brought the issue to the trial court's attention:

> MR. LASSITER [for Appellant]: Judge, I am still a little bit confused here. How am I supposed to write an appeal based on findings of fact and conclusions of law that do not contain hardly any of what occurred in that hearing? How am I supposed to write an accurate record for appeal if the only record that I have is the record that we had to do another record in order to complete—in order to fix the original record? We have to do another record?

> THE COURT: Well, that can be a good argument to the Court of Appeals, if that's what you want to do, you can't do it because there is no record. All right.

Court reporters in this state do outstanding work and lost records, thankfully, are extremely rare. Somewhat novel situations, such as this, do not lend themselves to rote error preservation. Appellant sufficiently alerted the trial court to his complaint as soon as the basis for it became apparent. *See, e.g.*, Tex. R. Evid. 103(a)(1); *Lovill v. State*, 319 S.W.3d 687, 692 (Tex. Crim. App. 2009); *Resendez v. State*, 306 S.W.3d 308, 312–13 (Tex. Crim. App. 2009); *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997); *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992).

5

**Standard of Review**

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

First, we view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede*, 214 S.W.3d 17, at 24–25; *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). We do not engage in our own factual review, but give almost total deference to a trial court's express or implied determination of historical facts, especially if those are based on the trial court's assessment of credibility and demeanor. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010); *State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007); *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). When the trial court makes explicit fact findings, as the trial court did in this case, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19.

Next, we review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818. We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

**The Trial Court's Findings of Fact and Conclusions of Law**

In its first set of findings of fact and conclusions of law, the trial court had concluded that the initial exchange between Wickham and Appellant was a voluntary encounter—not a detention or seizure under the Fourth Amendment— that progressed into an investigative detention supported by reasonable suspicion when Wickham observed signs that Appellant was intoxicated. The trial court concluded in the alternative that if the encounter was a seizure under the Fourth Amendment, it was a proper one because Wickham had reasonable suspicion that Appellant might have been in the parking lot for some criminal purpose or because Wickham had properly exercised his community-caretaking function. In its second set of findings and conclusions, the trial court dropped the theory that the stop was based on reasonable suspicion but kept its alternative conclusions that the encounter either was consensual or that the community caretaking exception applied.

**Reasonable Suspicion**

As an initial matter, we agree with the trial court's having abandoned its conclusion that the encounter was based on reasonable suspicion.

An investigative detention is a "seizure" for purposes of the Fourth Amendment. *Alexander v. State*, 879 S.W.2d 338, 341 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd), *cert. denied*, 514 U.S. 1127 (1995), (citing *Livingston v. State*, 739 S.W.2d 311, 327 (Tex. Crim. App. 1987), *cert. denied*, 487 U.S. 1210 (1988)). As opposed to an arrest, a detention may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). An officer conducts a lawful temporary detention when he or she has reasonable suspicion to believe that an individual is violating the law. *Crain*, 315 S.W.3d at 52; *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492. This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether there exists an objective basis for the stop. *Id*. The facts relied upon to support a conclusion of reasonable suspicion must amount to something more than an inchoate and general

8

suspicion or hunch. *Terry*, 392 U.S. at 21, 88. S. Ct. at 1880; *Woods v. State*, 956 S.W.2d 33, 35 (Tex. Crim. App. 1997).

The State argues and the trial court initially concluded that Wickham had reasonable suspicion to detain Appellant. Specifically, the trial court originally concluded that

> Officer Wickham had reasonable suspicion under the totality of the circumstances to detain the Defendant to investigate whether the Defendant was involved in some type of criminal mischief. Based on specific articulable facts and rational inferences from those facts, reasonable suspicion existed to believe that the Defendant may be involved in a burglary or other criminal undertakings.

In its findings issued after the first suppression hearing, the trial court found that sometime after 2:00 a.m., when no businesses were open, Wickham had observed a black BMW parked in an empty parking lot with its headlights and left turn signal illuminated and driver's side door open; and that Wickham had pulled into the lot due to the time of night, the location of the BMW, the headlights and left turn signal on and the door open, and the "potential for burglaries in that area."

The evidence in the record of the first hearing supports all these findings but one: we have found no evidence indicating any "potential for burglaries" in the area. Officer Wickham was the only witness at that first hearing. He testified that upon seeing Appellant's car with lights and blinker on and door open, his "initial thought was perhaps [Appellant] may be injured . . . needed help or something," but that he "also was curious or wondering about maybe a possible

9

break-in or that kind of thing with the businesses in the area being closed." He further testified that he pulled in to investigate "for any number of things that could have been wrong" including "breaking into buildings."

But apart from his guessing what, if anything, Appellant might have been up to, he did not articulate any specific facts that when combined with their rational inferences would have lead him to reasonably conclude that Appellant was, had been, or was about to engage in criminal activity. *See Ford*, 158 S.W.3d at 492. Wickham's curiosity or "wondering about maybe a possible break-in" amounts to nothing more than an inchoate and general suspicion or hunch. *See Terry*, 392 U.S. at 21, 88. S. Ct. at 1880; *Woods*, 956 S.W.2d at 35. That is not enough. *Cf. Derichsweiler v. State*, 348 S.W.3d 906, 917 (Tex. Crim. App.) (stating "[i]t is enough to satisfy" the reasonable suspicion standard "that the information is sufficiently detailed and reliable—i.e., it supports more than an inarticulate hunch or intuition."), *cert. denied*, 132 S. Ct. 150 (2011); *State v. Lopez*, 148 S.W.3d 586, 589–90 (Tex. App.—Fort Worth 2004, pet. ref'd) (holding that reasonable suspicion existed to believe appellee's truck might have been involved in burglary based on facts that burglary had just occurred, complainants had noticed the truck slowly drive by their residence—the scene of the crime—several times that evening, and officer saw appellee drive slowly past the residence and knew that burglars commonly return to crime scenes where they had been successful.) Accordingly, we hold that even in the light most favorable to the trial court's ruling, the record of the first hearing does not support

10

a conclusion that reasonable suspicion justified Appellant's detention. The trial court, therefore, correctly omitted this theory from its second set of conclusions.

## Voluntary Encounter

We also agree with the trial court that Wickham needed no justification to pull into the parking lot, observe Appellant, and even approach and speak to him. Police officers are as free as any other citizen to approach citizens on the street or in their cars and to ask for information or their cooperation. *Garcia–Cantu*, 253 S.W.3d at 243.

> Police officers may be as aggressive as the pushy Fuller-brush man at the front door, the insistent panhandler on the street, or the grimacing street-corner car-window squeegee man. All of these social interactions may involve embarrassment and inconvenience, but they do not involve official coercion. It is only when the police officer "engages in conduct which a reasonable man would view as threatening or offensive even if performed by another private citizen," does such an encounter become a seizure. It is the display of official authority and the implication that this authority cannot be ignored, avoided, or terminated, that results in a Fourth Amendment seizure. At bottom, the issue is whether the surroundings and the words or actions of the officer and his associates communicate the message of "We Who Must Be Obeyed."

*Id*.

> The mere approach and questioning of such persons does not constitute a seizure. The result is not otherwise when the officer utilizes some generally accepted means of gaining the attention of the vehicle occupant or encouraging him to eliminate any barrier to conversation. The officer may tap on the window and perhaps even open the door if the occupant is asleep. A request that the suspect open the door or roll down the window would seem equally permissible, but the same would not be true of an order that he do so. Likewise, the encounter becomes a seizure if the officer orders the suspect to "freeze" or to get out of the car. So too, other police action which one would not expect if the encounter was between two

11

private citizens—boxing the car in, approaching it on all sides by many officers, pointing a gun at the suspect and ordering him to place his hands on the steering wheel, or use of flashing lights as a show of authority—will likely convert the event into a Fourth Amendment seizure.

*Id*. (quoting 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9(a) (4th ed. 2004) (internal footnotes omitted)).

We further agree with the trial court and with the State that once Wickham noticed signs of intoxication, he had reasonable suspicion under the totality of the circumstances to detain Appellant to investigate whether he was DWI. *See, e.g., Franks v. State*, 241 S.W.3d 135, 142 (Tex. App.—Austin 2007, pet. ref'd.) (holding that initial encounter progressed to investigative detention when officer refused appellant's request to leave).

But Wickham did not notice the signs of intoxication until after he had shined his spotlight on Appellant's driver's side window. The question for a Fourth Amendment analysis is what was in between—that is, at what point did the encounter become a detention? More precisely: Did the encounter become a detention when Wickham employed his spot light and Appellant stopped in response?

A detention occurs when a person yields to an officer's show of authority or when a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter. *Florida v. Bostick*, 501 U.S. 429, 436, 111 S. Ct. 2382, 2387 (1991); *California v. Hodari D.*, 499 U.S. 621, 629, 111 S. Ct. 1547, 1552 (1991); *State v. Velasquez*, 994 S.W.2d 676, 678–79 (Tex. Crim.

App. 1999); *Johnson v. State*, 912 S.W.2d 227, 235 (Tex. Crim. App. 1995); *Martin v. State*, 104 S.W.3d 298, 300–01 (Tex. App.—El Paso 2003, no pet.). Two essential elements are thus required before a police-citizen encounter becomes a detention and therefore a seizure under the Fourth Amendment: a show of authority and a submission—an officer must make a show of authority to which a citizen yields. The second element is met in this case because the record shows that Appellant yielded: Wickham testified that Appellant abruptly returned his car to its parking space when Wickham shined the spotlight on the window.

The question of when an encounter between a police officer and a person in a car is a "detention" or "seizure" depends on specific facts as to the manner of the encounter, the degree of authority displayed, and all other circumstances surrounding the incident. *Garcia–Cantu*, 253 S.W.3d at 244. In *Garcia–Cantu*, the court of criminal appeals distinguished the use of a patrol car spotlight from use of its emergency lights. *Garcia–Cantu*, 253 S.W.3d at 245; *see Crain*, 315 S.W.3d at 50. Considering numerous cases throughout the nation, the court noted that, while emergency lights are often involved in detention scenarios, spotlight use is often classified as necessary during police-citizen encounters and its use will not necessarily convert an encounter into an investigatory detention. *Garcia–Cantu*, 253 S.W.3d at 245; *see Crain*, 315 S.W.3d at 50; *Franks*, 241 S.W.3d at 142 ("Use of the patrol car's overhead lights in an area that appeared dark and unoccupied except for a single car does not necessarily constitute a

13

detention."); *Martin*, 104 S.W.3d at 301 (concluding that officer's use of overhead lights did not necessarily cause encounter to become stop).

Each citizen-police encounter must be factually evaluated on its own terms; there are no *per se* rules. *Garcia–Cantu*, 253 S.W.3d at 243. The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. *Id*. (*citing Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S. Ct. 1975, 1979 (1988)).

In determining whether a reasonable person would have felt free to leave, we look at the officer's conduct as well as the setting in which the police-citizen interaction takes place. *Crain*, 315 S.W.3d at 51; *Garcia–Cantu*, 253 S.W.3d at 244; *see United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870 (1980) (one factor to consider in determining if the interaction was a detention is "the use of the language or tone of voice indicating that compliance with the officer's request might be compelled"); *Orhorhaghe v. I.N.S.*, 38 F.3d 488, 495–96 (9th Cir. 1994) (finding a Fourth Amendment seizure had occurred when the tenor of the instructions the agent gave the citizen was not that used among citizens in everyday interaction, but instead was "authoritative and appeared to give [defendant] no option to refuse to comply.").

The court of criminal appeals has explained that, although using the spotlight alone is not enough to lead a reasonable person to think he is not free to go, use of the spotlight is *a factor* to be considered in the totality-of-the-

circumstances assessment and, "combined with other circumstances, may well establish a Fourth Amendment detention." *Crain*, 315 S.W.3d at 51; *Garcia–Cantu*, 253 S.W.3d at 245; *see e.g., State v. Jestice*, 861 A.2d 1060, 1062–63 (Vt. 2004) (finding a detention implicating the Fourth Amendment where a uniformed officer parked his marked patrol car late at night in a dark lot with no one else around, left the cruiser's headlights shining in the detained couple's faces as he approached them, and asked them what they were doing).

Appellant contends that given other factors in this case combined with the use of the spotlight, no reasonable person in his position would have felt free to leave. He asserts that as soon as he began backing from his parking space to leave the location, Wickham shined an intensely bright police spotlight directly at him from a marked patrol car coming up from behind and obstructing his movement by blocking a path of egress. And he claims that the lost record of the second hearing reflects that Wickham "parked behind and to the right of [him] partially blocking his ability to back out of the space." He also claims that the lost record also reflects that Wickham "turned on his dashboard camera showing he approached [Appellant] with the intent of doing an investigation" and that Wickham approached him "in uniform" and "demanded to know 'what are you doing'" in a voice that was "commanding" and "authoritative."[2]

---

[2]Appellant's counsel asserted during oral argument,

And when the officer got out, he displayed a show of authority: he had a uniform, he had a badge, he had a gun, he had a flashlight, he

15

In its second set of findings the trial court found that "Wickham stopped and parked his patrol vehicle to the left of and perpendicular to" Appellant's car and that Appellant "could have easily and safely backed out of the parking spot and driven away." The only record before us today, however, does not reveal the position of Wickham's patrol car relative to Appellant's BMW. Nor does it, for that matter, indicate that the patrol car was marked or that Wickham was armed or even in uniform when he approached Appellant. Those may be reasonable assumptions one can make, but the record is silent on whether they are factual. The record likewise does not speak to whether Wickham activated his in-car video recorder, and although Appellant's counsel advised us during oral argument that he had a copy of the DVD recorded during the stop, we have no record indicating that it was ever admitted or even offered in evidence.

In short, because even in the light most favorable to the trial court's ruling the record that we have does so little to illuminate the critical issue of whether a reasonable person would have felt free to ignore Wickham's spot-lit approach, we cannot say that it supports the trial court's conclusion that Wickham's and Appellant's late-night encounter was consensual and thus did not offend the Fourth Amendment.

---

was in a marked patrol car, he vocalized his command by saying 'what are you doing here?' He did so in an authoritative tone of voice. Now, you don't have that information in front of you because that was at the second hearing.

But even if the record does not support the trial court's ruling based on a voluntary encounter, it will be upheld if correct for any reason. In this case, there is one remaining candidate, one that the trial court relied upon as an alternative theory in both sets of conclusions of law issued after each hearing.

### Community Caretaking

In both its conclusions of law, the trial court concluded in the alternative that Appellant's detention had been a proper exercise of Wickham's community caretaking function.

Because a police officer's duties involve activities other than gathering evidence, enforcing the law, or investigating crime, the Supreme Court has characterized a police officer's job as encompassing a community caretaking function. *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973); *Wright v. State*, 7 S.W.3d 148, 151–52 (Tex. Crim. App. 1999). Even without having reasonable suspicion or probable cause that an offense has been committed, a police officer may reasonably seize an individual through the exercise of his community caretaking function. *Corbin v. State*, 85 S.W.3d 272, 276 (Tex. Crim. App. 2002); *see Wright*, 7 S.W.3d at 151–52; *see also United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993). As part of an officer's duty to "serve and protect," an officer "may stop and assist an individual whom a reasonable person, given the totality of the circumstances, would believe *is in need of help.*" *Wright*, 7 S.W.3d at 151 (emphasis added).

17

The community caretaking function, however, is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441, 93 S. Ct. at 2528; *Corbin*, 85 S.W.3d 276–77. As a result, a police officer may not properly invoke his community caretaking function if he is primarily motivated by a non-community caretaking purpose. *See Wright*, 7 S.W.3d at 151. ("[W]e must determine if [the officer] acted reasonably when he stopped the vehicle *out of concern for the welfare of the appellant* . . .".) (emphasis added). Professor LaFave explains, "[I]t apparently remains open to defendants, whenever the challenged seizure or search is permitted without probable cause because of the special purpose being served, to establish a Fourth Amendment violation by showing the action was in fact undertaken for some other purpose . . .". *Corbin*, 85 S.W.3d at 277 (citing Search and Seizure § 1.4 (3d ed. 1996)).

Here, the record reflects that Wickham was concerned that Appellant may have been injured, had medical problems—possibly diabetes or diabetic shock—needed help and, as previously discussed, "also was curious or wondering about maybe a possible break-in or that kind of thing."[3] Although the record reflects that Wickham had a number of motivations for checking on Appellant, the trial court, as the exclusive judge of credibility and finder of fact, could have

---

[3]Wickham testified that in his offense report he wrote "investigative stop" as the reason for the stop despite the form report's listing "welfare concern" as a distinct category of reasons for a stop.

concluded that Wickham was primarily motivated by community-caretaking concerns. *See Corbin*, 85 S.W.3d at 277; *Ross*, 32 S.W.3d at 855.

Once it is determined that an officer is primarily motivated by his community caretaking function, it must then be determined whether the officer's belief that the defendant needs help is reasonable. *Corbin*, 85 S.W.3d at 277; *Wright*, 7 S.W.3d at 151–52. In evaluating whether an officer reasonably believes that a person needs help, courts may look to a list of four non-exclusive factors: (1) the nature and level of the distress exhibited by the individual; (2) the location of the individual; (3) whether or not the individual was alone and/or had access to assistance other than that offered by the officer; and (4) to what extent the individual, if not assisted, presented a danger to himself or others. *Corbin*, 85 S.W.3d at 277; *Wright*, 7 S.W.3d at 152.

Because the purpose of the community caretaking exception is to allow an officer to "seize" and assist an individual whom he reasonably believes is in need of help, the first factor is entitled to the greatest weight. *Corbin*, 85 S.W.3d at 277. The greater the nature and level of distress that is exhibited, the more likely that the police involvement will be a reasonable exercise of the community caretaking function. *Id*. This is not to say that the weight of the first factor alone will always be dispositive. *Id*. In fact, the remaining three factors help to give more definition to the first factor. *Id*. A particular level of distress that is exhibited may be seen as more or less serious depending on the presence or absence of the remaining three factors. *Id*.

19

Here, evidence of the first factor, the nature and level of the distress exhibited, is almost nonexistent because Wickham specifically testified that he did not observe Appellant in *any* distress all though he *felt like there might have been*. The record reflects the following:

> Q. [by Defense counsel] . . . [Y]ou didn't observe any type of distress?
>
> A. Correct. I didn't observe any type of distress.
>
> Q. Throughout this entire process, you never observed Mr. Hernandez in any type of distress, correct?
>
> A. Correct.
>
> Q. Okay. Now, you said that you were concerned that he was injured and needed help, initially, but those were dispelled pretty quickly, correct?
>
> A. Yes, sir.
>
> Q. Those thoughts. All right. You mentioned that he roughly applied the brakes and hit his head. He didn't have a mark on his forehead after that, did he?
>
> A. Not that I observed, no sir.
>
> Q. So there was nothing medically wrong from him bumping his head?
>
> A. Not that I'm aware of.

On redirect, the prosecutor asked Wickham if he felt that Appellant's hitting his head on the steering wheel was "distress."

> Q. Okay. Did you feel like there was distress when you saw the defendant hit his head on the steering wheel or there could be?

20

A. Yes, ma'am, but I didn't know what was going on, if maybe he was having a medical emergency and had lost normal use of his physical faculties or.

MS. LASETER [for the State]: Pass the witness.

Seeing a driver bump his head on the steering wheel could suggest some level of distress. But the trial court found that Wickham did not see Appellant bump his head until *after* Wickham had pulled into the parking lot and shined his spotlight on Appellant's driver side window. This finding is supported by the record. The record reflects that Appellant pulled forward and braked suddenly *after* (and possibly in response to) Wickham directed the spot light at him. Wickham testified on direct as follows:

Q. Did the vehicle move at all once you pulled into the parking lot?

A. Yes, ma'am, as I pulled in the parking lot, I observed the vehicle back out of its spot where it was parked. I then turned on my spotlight, shined it in the driver's side window to see who was inside. *When I did that*, the vehicle pulled back into the parking spot and stopped. [Emphasis added.]

Wickham also testified, "As he backed out and I turned on the spotlight and he went to pull back in, I observed they [sic] abruptly applied their [sic] brakes and when he did so, he did it with such force he hit his head on the steering wheel." On cross examination, Wickham testified that he assumed that Appellant abruptly pulled back into the parking space in response to Wickham's shining the spotlight on him. He further testified that if Appellant had not seen him, Appellant would have continued to drive on. So whatever evidence there is in the record

21

that Appellant exhibited any level of distress did not arise until after Wickham approached Appellant and shined his spotlight on him. In other words, Wickham caused the distress that the State now argues justified Appellant's warrantless detention through the community caretaking exception.

Further, the level of distress reflected by the record, to the extent that it exists at all, is extremely low: the bump on the steering wheel was not hard enough to leave a mark:

> Q. [. . .] You mentioned that he roughly applied the brakes and hit his head. He didn't have a mark on his forehead after that, did he?
>
> A. Not that I observed, no sir.
>
> Q. So there was nothing medically wrong from him bumping his head?
>
> A. Not that I'm aware of.

Nor, was the level of distress serious enough for Wickham to ask whether Appellant was okay or whether he needed assistance, as the following excerpt shows:

> Q. Okay. And then you approach, and the first thing that you ask them [sic] once you approach was, what are you doing, correct?
>
> A. Yes, sir.
>
> Q. You did not ask [Appellant] are you okay, correct?
>
> A. Yes, sir.
>
> Q. You did not ask him, do you need help, correct?
>
> A. Correct.

22

Q. You didn't ask him if he needed assistance?

A. Correct.

Q. You didn't ask him if there was any medical concern whatsoever, correct? You asked him, ["]What are you doing?["]

A. Yes, sir.

Because the evidence of any distress is extremely low and was caused by Wickham's intervention, this factor weighs against the trial court's conclusion that Wickham's detention of Appellant was justified by the community caretaking exception.

Concerning the second factor, the location was in a car in an empty business parking lot. Although Appellant was there late at night, nothing in the record indicates that Appellant was stranded there or that the area was isolated or dangerous. At best, this is a neutral factor. *See Corbin*, 85 S.W.3d at 278.

The third factor also is neutral. Although Appellant was alone in the car when Wickham first saw him, there was testimony that he had called someone to come pick him up. Of course, Wickham would not have known this before Appellant told him, so this factor—whether Appellant had access to assistance independent of Officer Wickham—works neither against nor for the stop.

The fourth factor, the extent to which the individual presented a danger to himself or to others if not assisted, weighs against the stop's justification under the community caretaking exception. The record shows that Appellant did not present a threat to anyone in the parking lot because Wickham testified that there

was no one else there. And to the extent the record supports an inference that Appellant presented any danger to himself, that inference did not arise until after he yielded to Wickham's spotlight.

Applying the *Wright* factors, we conclude that Officer Wickham's exercise of his community caretaking function was not reasonable. Although it certainly would be reasonable for a police officer to approach an individual who appears to be injured or having a medical emergency while driving, the level of distress exhibited here as shown in the record does not reflect such an individual. The level of distress exhibited by Appellant was simply too minor for Wickham to reasonably believe that Appellant was injured or in need of assistance. *Cf. Lebron v. State*, 35 S.W.3d 774, 776–77 (Tex. App.—Texarkana 2001, pet. ref'd) (police officer reasonably exercised community caretaking function when the officer, responding to a reported accident, discovered the defendant driving very slowly, eventually coming to a stop on the road, with two flat tires). Accordingly, we hold that Appellant's interest in being free from arbitrary government interference outweighed Officer Wickham's exercise of his community caretaking function. *U.S. v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S. Ct. 2574, 2578–79 (1975); *King*, 990 F.2d at 1560; *Corbin*, 85 S.W.3d at 278–79; *Wright*, 7 S.W.3d at 151–52.

**Conclusion**

Viewed in the light most favorable to the trial court's ruling, we hold that the evidence in the record we have does not reasonably support a conclusion that Appellant's initial encounter with law enforcement was justified by either reasonable suspicion or community caretaking. *See Crain*, 315 S.W.3d at 48; *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006); *Romero*, 800 S.W.2d at 543. And the record that is before us is inconclusive on the issue of whether the initial encounter was a voluntary encounter and therefore not a detention under the Fourth Amendment.

But the record also indicates that the trial court considered evidence in the second hearing germane to Appellant's first point on appeal that it did not consider in the first hearing.[4] Therefore, because the record suggests that the issue of voluntary encounter was litigated at the second suppression hearing—the record from which is lost—we hold that the trial court incorrectly found that the lost record is not necessary to the resolution of this appeal. We further hold that because that record may have contained evidence showing that Appellant was seized in violation of his constitutional rights, the trial court's incorrect finding caused Appellant harm. *See Issac v. State*, 989 S.W.2d 754, 757 (Tex. Crim. App. 1999). Accordingly, we sustain Appellant's second point, vacate the denial

---

[4]For instance, the trial court made specific findings relative to the placement of Wickham's patrol car, which if it blocked in Appellant's car and prevented him from leaving, would be critical facts to the issue of whether a reasonable person would have felt free to leave.

25

of Appellant's motion to suppress, reverse the judgment, and remand this case for a new trial. *See* Tex. R. App. P. 34.6(f); 43.2(d).

PER CURIAM

PANEL:  GABRIEL, WALKER, and MCCOY, JJ.

PUBLISH

DELIVERED:  August 2, 2012