

# COURT OF APPEALS

### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-16-00423-CR

ANGELA OSBURN COLLINS                                        APPELLANT

V.

THE STATE OF TEXAS                                                  STATE

----------

### FROM COUNTY COURT AT LAW NO. 1 OF PARKER COUNTY
### TRIAL COURT NO. CCL1-15-0114

----------

## MEMORANDUM OPINION[1]

----------

The State charged Angela Osburn Collins with driving while intoxicated. After the trial court denied her motion to suppress, Collins pleaded guilty, the trial court found her guilty, and it then sentenced her to 60 days' confinement in the county jail and a $300 fine. Collins appeals the denial of her motion to suppress,

---

[1]*See* Tex. R. App. P. 47.4.

arguing in two related points that she was unlawfully detained and that the police did not have reasonable suspicion to detain her. We affirm.

## Suppression-hearing evidence

### *Alexander Stewart testimony*

At around 2:00 a.m. on December 6, 2014, Alexander Stewart was working the back window at the Azle McDonald's, where he operated the intercom and took orders. Stewart described a female customer he had that night—a customer who turned out to be Collins—whom he had trouble understanding over the intercom because she slurred her speech. From that, he took it that she might be inebriated. Stewart testified that when Collins pulled up to his window, she "[reeked] of alcohol"; he characterized her slurred speech as "awful." So he asked her to pull forward to a reserved parking spot and then called 911.

But on cross-examination, after listening to his 911 call, Stewart acknowledged that he made that call even before Collins appeared at his window. During the 911 call, he described Collins as "extremely inebriated" and "unsafely inebriated." Stewart called 911 a second time to correct his description of Collins's vehicle, which was a silver SUV rather than a white van as Stewart had initially reported. He also acknowledged that the 911 dispatcher told him to keep Collins there as long as possible and explained that that was why he instructed Collins to pull forward. Stewart acknowledged that he was complying with the dispatcher's instructions and was "just following dispatch's orders."

2

Stewart also agreed that the only information he provided the dispatcher was that Collins was "extremely inebriated" and "unsafely inebriated."

Stewart did not recall if he took Collins's money at the window but thought that he probably did. It was then that he told Collins to pull around the corner and stay there, and he would have her food brought out to her. Because once people pay for their food they usually wait for it, Stewart acknowledged that delaying Collins's food effectively detained her there for the police.

After the police arrived, Stewart said at the hearing that he then gave them a statement containing additional information, including such details as her slurred speech and the odor of alcohol, that he did not give to the 911 dispatcher.

### Officer MacQuarrie testimony

Officer Jordan MacQuarrie of the Azle Police Department was also working around 2:00 a.m. on December 6, 2014, and was dispatched in response to a 911 call involving a suspected intoxicated or inebriated driver in a drive-through. Initially, the dispatcher told him to look for a white vehicle, but just as he was pulling into an adjacent parking lot, the dispatcher clarified that he should look for a silver Ford Escape. That was precisely what he saw pulling around the building and stopping near the front main entrance in a "through lane." By having pulled forward, Collins was not blocked in, and no other vehicles were in the drive-through at the time. Officer MacQuarrie then stopped about fifty yards behind the Escape and waited, intending to make contact once the car moved again. But

3

when his backup, Officer Shide, arrived, Officer MacQuarrie decided to go ahead and speak to the driver.

Pulling his patrol car forward and toward the back of the Escape—the front of which was not obstructed in any way—Officer MacQuarrie got out and approached Collins's car from the rear driver's side. At the same time, a McDonald's employee brought Collins her food and then walked away. Officer MacQuarrie approached the Escape's driver's-side window, which was already down, and identified himself. At the suppression hearing, he denied that Collins was detained at this point.

Officer MacQuarrie explained to the trial court that dispatch had indicated simply a possible intoxicated driver, so he and Officer Shide discussed beforehand the basis of their initial contact and settled on "sort of a welfare concern" based on the 911 call. When Officer MacQuarrie walked up to Collins's car, he acknowledged that he did not know if she was intoxicated. "I only had basically that welfare call," he explained, "or the call that she might be intoxicated." Officer MacQuarrie testified that he has the authority to walk up to anyone sitting in a parked car and ask if the car's occupant is all right: "I can say hello, I can do a welfare check, or contact anybody."

Once at Collins's window, as Officer MacQuarrie testified, "I identified myself. I told her straightforward why I was talking with her. Explained that it was because somebody had called and that there was suspicion that she might be intoxicated." He stated that he asked Collins if she was all right, and she

4

responded that she was "going through a lot" and was coming from "Reno," and "her place," when Officer MacQuarrie asked where she was coming from. When Collins responded, he noticed that her eyes were "bloodshot, watered, heavy" and that her speech was slurred. Even with a fairly strong wind, Officer MacQuarrie said that he could smell a light odor of alcohol while she was talking to him, adding that Collins's voice was very quiet and so he had to lean in to hear her. According to Officer MacQuarrie, it was only after he made these observations that he asked Collins to step out of her car and detained her at that point. (At that time, Officer Shide was standing on the other side of Collins's car.) From talking to her, Officer MacQuarrie said he had reasonable suspicion that she was possibly intoxicated, and that when he detained Collins he had not yet made up his mind whether he was going to arrest her.[2]

Officer MacQuarrie acknowledged that the dispatcher had told him that the vehicle had pulled around the McDonald building's side and that someone was going to bring Collins's food out to her. The dispatcher also indicated that "the employees would attempt to prevent her from further operation of the vehicle by delaying the order." At the hearing, Officer MacQuarrie further acknowledged that when Officer Shide pulled up, Officer MacQuarrie asked him, "[W]hat are we

---

[2]Collins acknowledged at the suppression hearing that if the trial court found reasonable suspicion for the detention, then it need not determine whether probable cause for her arrest existed.

5

going on here?" Officer MacQuarrie agreed that he did not then know the contents of the 911 call but rather only what the dispatcher told him.

Both officers had their flashlights out when they approached Collins's car. Officer MacQuarrie testified that his patrol car was fully marked as an Azle Police Department car, that he was in full uniform, and that he was armed. Officer Shide parked his own patrol car on the Ford Escape's passenger side and got out when Officer MacQuarrie did.[3] Describing the parking lot as fairly well-lit, Officer MacQuarrie did not recall using his patrol-car spotlight to illuminate Collins's driver's-side area and denied having his overhead lights on.

When asked whether two fully armed and uniformed officers approaching from either side was a "show of authority," Officer MacQuarrie responded that "when I made contact with her, my first question was is everything all right[?]" He added, "Regardless of how it looks, that's how we would approach a vehicle anytime." Pressed further on whether their approach was a show of authority, Officer MacQuarrie answered, "Uniformed officers always have a presence of authority," and agreed that he could "understand" if someone would feel detained. Nevertheless, Officer MacQuarrie had experienced people leaving in that situation: "I've had people tell me verbatim, you can beat feet and pound sand. Which basically means leave me alone and go away. And I have had to do

---

[3]Officer MacQuarrie had a civilian passenger that night who remained in Officer MacQuarrie's patrol car.

6

that." He denied that if Collins had left, he would have had reasonable suspicion that she was evading arrest or detention.

In announcing its ruling, the trial court said, "The Motion to Suppress evidence is denied. And all parties are free to beat feet." In its factual findings, the trial court found that Officer MacQuarrie's initial encounter with Collins was consensual and that he developed a reasonable suspicion that she was driving while intoxicated only after talking with her; only then did Officer MacQuarrie detain her to investigate more thoroughly. No one else detained Collins.

**The record supports the trial court's findings that Collins was not detained until after Officer MacQuarrie spoke with her in a consensual encounter, and that based upon what he saw during this encounter, he had reasonable suspicion to detain her.**

Because Collins's two issues are intertwined, we will discuss them together. The questions we must answer are, essentially, (1) when was she detained? and (2) at that particular time, did the police have reasonable suspicion to detain her? In answering these questions, we can break down the sequence of events into three possibilities:

- Collins was detained without reasonable suspicion when Stewart, acting as an agent of the State, instructed her to pull forward for the express purpose of keeping her there until the police arrived;

- she was detained without reasonable suspicion when Officers MacQuarrie and Shide approached her vehicle from two sides with flashlights trained on her, which she contends amounted to a show of authority not to leave; or

- Officer MacQuarrie did not detain Collins until after speaking with her, and he had reasonable suspicion then to do so based on what he observed during his consensual conversation with her.

7

Collins argues the first two possibilities. The trial court found, and on appeal the State argues, the third. We hold that the record supports the third scenario, and the trial court thus did not err by denying Collins's motion to suppress.

**Standards of review**

We apply a bifurcated standard of review to a trial court's ruling on a suppression motion. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole factfinder and judge of the witnesses' credibility and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). As a result, we give almost total deference to the trial court's rulings on (1) historical fact questions, even if the trial court did not determine those facts based on evaluating credibility and demeanor, and (2) application-of-law-to-fact questions that turn on credibility and demeanor evaluations. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the witnesses' credibility and demeanor, we review the

8

trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to its ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the ruling, supports those findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

As for our review of whether a law-enforcement agent had reasonable suspicion to detain someone, such suspicion exists when, based on the totality of the circumstances, an officer has specific, articulable facts that when combined with rational inferences from those facts would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Hernandez v. State*, 376 S.W.3d 863, 869 (Tex. App.—Fort Worth 2012, no pet.). An objective standard, it disregards the officer's subjective intent and examines only whether an objective basis for the stop exists. *Id.* The facts relied on to support a reasonable-suspicion conclusion must amount to something more than an inchoate and general suspicion or hunch. *Id.*

9

### A. Who detained Collins and when?

#### 1. Stewart did not detain Collins because he was not an agent of the State.

Collins argues that Stewart, acting as an agent of the State, detained her when he followed the dispatcher's instructions to ask her to pull forward for the express purpose of keeping her there until the police arrived. We disagree.

Based on our reading of applicable law, Stewart was not an agent of the State. In the context of *Miranda*[4] warnings and who must give them, for example, the Texas Court of Criminal Appeals has written that *Miranda* applies only to custodial questioning by law-enforcement officers or their agents. *Wilkerson v. State*, 173 S.W.3d 521, 527 (Tex. Crim. App. 2005). The court then described the two types of "state agents." *Id.* First, any employee of a state agency is, by definition, a "state agent." *Id.* at 528. Second, even among those, only state employees working for or on behalf of the police are law-enforcement "state agents." *Id.* The court explained that "[a]lthough state employment clearly makes a person an 'agent of the State,' that label does not, by itself, make the person an 'agent of the State' for the purpose of defining 'custodial interrogation.'" *Id.* The court added, "Our law recognizes that different types of state employees serve different roles. It is law enforcement's job to ferret out crime, investigate its

---

[4]*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct 1602, 1612 (1966). The Texas Code of Criminal Procedure expressly sets out the *Miranda* requirements by requiring officers to inform detainees of their rights before any custodial interrogation in order to make any resulting statements admissible. Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (West Supp. 2017).

10

commission, arrest the perpetrator, and gather evidence for a possible prosecution." *Id.*

For purposes of detentions, we see no reason to apply a different standard. Because Stewart was not a state employee, he was not and could not have been an agent of the state in any capacity. *See id.* at 527–28; *see also Woods v. State*, 970 S.W.2d 770, 774–75 (Tex. App.—Austin 1998, pet. ref'd) (holding that in temporarily detaining appellant, private security guard employed by sheriff's department was agent of the State and had reasonable suspicion to make the detention, and stating further that even if the guard was not a state agent, "[a] temporary detention by a private individual does not violate" the Fourth Amendment.); *Garner v. State*, 779 S.W.2d 498, 501 (Tex. App.—Fort Worth 1989) ("[A] private citizen does not have the authority to make a *Terry* stop."), *pet. ref'd*, 785 S.W.2d 158 (Tex. Crim. App. 1990) (stating expressly that refusing the State's petition for discretionary review did not constitute endorsing or adopting the intermediate appellate court's reasoning).

Stewart was a citizen assisting the police. The United States Supreme Court has written that "it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." *Coolidge v. New Hampshire*, 403 U.S. 443, 488, 91 S. Ct. 2022, 2049 (1971), *overruled on other grounds by Horton v. California*, 496 U.S. 128, 137–42, 152, 110 S. Ct. 2301, 2308–11, 2315 (1990). In this case, Stewart—in his citizen capacity—did nothing more than aid the

11

police so that they could speak to someone who he thought posed a danger to herself and others. *See id.* Deliberately delaying a food order to facilitate that conversation between the police and Collins is not against the law. *See* Tex. Code Crim. Proc. Ann. art. 38.23(a) (West 2005) ("No evidence obtained by an officer or other person in violation of [the law] shall be admitted in evidence against the accused on the trial of any criminal case."); *see also Escobedo v. State*, No. 08-08-00318-CR, 2010 WL 2621579, at *3 (Tex. App.—El Paso June 30, 2010, no pet.) (not designated for publication) ("The government may not encourage conduct by private persons that the government itself cannot do . . . .").

### 2. Officers MacQuarrie and Shide did not detain Collins by approaching her car with flashlights and from two sides.

Collins next argues that Officers MacQuarrie and Shide detained her when they approached her car from opposite sides with flashlights shining because their actions amounted to a show of authority to restrain her liberty. Because a show of authority differs from a show of authority that is tantamount to a detention, we disagree.

Courts will conclude that a Fourth Amendment "seizure," or detention, has occurred only when an officer, by means of physical force or a show of authority, has in some way restrained a citizen's liberty. *State v. Garcia-Cantu*, 253 S.W.3d 236, 242 (Tex. Crim. App. 2008). Such a seizure occurs when, taking into account all the circumstances surrounding the encounter, the police's conduct

12

would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. *Id.*

The evidence showed that Officer MacQuarrie did not use his overhead lights, and there is no mention of his using his siren or a loud-speaker, which in these circumstances would have been clear-cut shows of authority equivalent to a directive not to leave. Collins contends that she was partially blocked in—from the rear and the side—but the evidence shows that she was in a through lane and was not prevented from going forward. The officers neither boxed her in with their patrol cars nor approached her vehicle from the front with any hand gestures or other signals not to leave. No guns were drawn. Neither officer instructed her to leave her car before having spoken to her.

What the officers did do is approach her car from two sides, at night and with flashlights. Collins emphasizes that when a police officer engages in conduct that a reasonable person would view as threatening or offensive—even if another private citizen performed it—the encounter becomes a seizure. *See id.* at 243. But no *per se* rules exist to determine when a detention occurs, and each set of facts must be evaluated on its own, based on the totality of the circumstances. *Id.*

If private citizens approached Collins's vehicle in this manner at this time of night, she might be well-advised to drive away. Similarly, if private citizens approached a vehicle in this manner, the driver might feel free to tell them to go away and leave her alone. But of course these were not private citizens; these were police officers.

13

As Officer MacQuarrie candidly acknowledged, uniformed police officers always have a presence of authority. Under these circumstances, a reasonable citizen might not feel free to simply drive away, if only because, despite the presumption of innocence, fleeing the scene might be construed as a sign of guilt. *See Illinois v. Wardlow*, 528 U.S. 119, 122, 124, 120 S. Ct. 673, 676 (2000); *Garcia-Cantu*, 253 S.W.3d at 243; *Baxter v. State*, No. 06-07-00054-CR, 2007 WL 4118170, at *3 (Tex. App.—Texarkana Nov. 21, 2007, no pet.) (mem. op., not designated for publication); *Smithers v. State*, No. C14-89-00615, 1990 WL 93181, at *1 (Tex. App.—Houston [14th Dist.] July 5, 1990, pet. ref'd) (not designated for publication). Although Officer MacQuarrie testified that citizens can drive away or tell the officers to "beat feet and pound sand" under these circumstances without repercussions, for an innocent citizen to do so would be atypical. Furthermore, compliance with the police should be encouraged. *See California v. Hodari D.*, 499 U.S. 621, 627, 111 S. Ct. 1547, 1551 (1991). The dynamics between citizens interacting with one another and citizens interacting with the police are different, and fleeing or evading a police officer can have bad consequences.

Here, police officers in police uniforms were approaching Collins from police cars. Indeed, Collins's argument is premised on the fact that these were police officers. Although it was night, the parking lot was lit. And although the officers' conduct might be threatening if performed by other citizens, it should not necessarily be threatening when performed by police officers. Moreover, for

14

safety reasons, it makes sense that officers would approach a vehicle at night with their flashlights and, regardless of whether it was day or night, that they would approach from opposite directions. In the context of this case, the officers' conduct—while certainly a show of authority—was not necessarily a show of authority for the purpose of detaining Collins.

Rather, the officers' conduct showed that they clearly wanted to speak with Collins. But that does not translate into a detention; it is instead an implicit request for a consensual encounter. For Fourth Amendment purposes, an officer's request differs from an officer's order. *See Crain v. State*, 315 S.W.3d 43, 54 (Tex. Crim. App. 2010) (Cochran, J., concurring). As Judge Cochran put it: "A request signifies a consensual encounter beyond the purview of the Fourth Amendment; a command, if heeded, usually denotes a Fourth Amendment detention. A request is a question that asks for an answer; an order is a command which requires obedience." *Id.* at 54–55 (footnotes omitted). As noted, if the officers had wanted to make a show of authority that Collins was not to leave, they had several unequivocal means by which to do so. What matters is whether Collins was restrained in her freedom to move. *See Garza v. State*, 771 S.W.2d 549, 556 (Tex. Crim. App. 1989). Although Officers MacQuarrie and Shide approached Collins's vehicle in a manner designed to maximize officer safety, they did nothing to restrain her freedom of movement.

We are not persuaded that citizens are put to the Hobson's choice of (1) standing their ground and ignoring an officer's presence—that is, pretending

15

the officer is not there—or (2) leaving without acknowledging the officer, notwithstanding the officer's signaled request for a consensual encounter. A reasonable, presumptively innocent person might ask the officer how he or she could be of help, and when Officer MacQuarrie asked if Collins was okay, she could have responded that she was fine, thanked the officer for his concern, and remarked that if there was nothing else, she would be on her way.[5] The United States Supreme Court has consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure. *Florida v. Bostick*, 501 U.S. 429, 437, 112 S. Ct. 2382, 2387 (1991). Here, though, by saying she was "going through a lot," Collins effectively responded that she was *not* okay and proceeded to voluntarily talk with Officer MacQuarrie.

An encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. *Id.* at 434, 112 S. Ct. at 2386. The test is whether, taking into account all circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that she was not at liberty to ignore the police presence and go about her business. *Id.* at 437, 112 S. Ct. at 2387. As the Texas Court of Criminal Appeals has analogized, Collins never told the "pushy Fuller-brush man at the front door"—as she could have—that she was not

---

[5]Although articulated differently, this is just a polite paraphrase of "beat feet and pound sand." That is, a citizen can engage the officer for the limited purpose of declining a consensual encounter.

interested. *See Garcia-Cantu*, 253 S.W.3d at 243. To the contrary and in short, Collins consented to interact with Officer MacQuarrie.

We hold that the trial court did not err by finding that no detention occurred until after Officer MacQaurrie had spoken with and observed Collins.

## B. Did Officer MacQuarrie have reasonable suspicion to detain Collins after speaking with her?

Having determined that the detention occurred only at the point when Officer MacQuarrie instructed Collins to get out of her car, we now turn to whether he had reasonable suspicion for doing so.

While Collins was explaining why she was not okay, Officer MacQuarrie noticed signs of intoxication. Her eyes were "bloodshot, watered, heavy." Her speech was slurred. Even with a wind, he could smell alcohol. Earlier, he had watched her drive her car forward to the waiting area. On these facts, we further hold the trial court did not err by finding that Officer MacQuarrie had reasonable suspicion to detain Collins for driving while intoxicated based on his conversation with her. *See id.; Rubeck v. State*, 61 S.W.3d 741, 745 (Tex. App.—Fort Worth 2001, no pet.) (op. on reh'g).

We overrule Collins's first and second issues.

## Conclusion

Having overruled both of Collins's issues, we affirm the trial court's judgment.

17

/s/ Elizabeth Kerr
ELIZABETH KERR
JUSTICE

PANEL:  WALKER, KERR, and PITTMAN, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  March 1, 2018