Victor ANDREWS, Appellant

v.

DT CONSTRUCTION, INC., Appellee.

No. 11–05–00058–CV.

Court of Appeals of Texas, Eastland.

Aug. 31, 2006.

Eric V. Blanchard, Law Office of Eric V. Blanchard, Loren G. Klitsas, Klitsas & Vercher, P.C., Houston, for appellant.

Jack McKinley, Ramey, Chandler, McKinley & Zito, P.C., Houston, for appellee.

Panel consists of WRIGHT, C.J., and McCALL, J., and STRANGE, J.

**OPINION**

TERRY McCALL, Justice.

Victor Andrews sued for injuries he received while working as an electrician for Brien Call Electric. Brien Call Electric was a subcontractor to the general contractor, DT Construction, Inc., at a construction project at C.E. King High School. As Andrews's lawyer succinctly stated in his opening statement, "Victor Andrews, as he was climbing down the scaffold, fell when the scaffold tipped over." The jury found Andrews to be 75% negligent and DT Construction to be 25% negligent. Andrews argues that there was legally insufficient evidence for the jury to find contributory negligence and factually insufficient evidence for the jury to find Andrews to be 75% negligent and DT Construction to be 25% negligent. We affirm.

*Standard of Review*

In analyzing Andrews's no-evidence challenge, we must determine whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). We must review the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable fact-finder could and disregarding any contrary evidence unless a reasonable fact-finder could not. *Id.* at 821–22, 827. We may sustain a no-evidence or legal sufficiency challenge only when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810 (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Texas L.Rev. 361, 362–63 (1960)).

In reviewing appellant's factual sufficiency challenge, we must consider and weigh all of the evidence and determine whether the evidence in support of the jury's finding is so weak as to be clearly wrong and unjust or whether the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). When conducting a factual sufficiency review, we cannot substitute our judgment for that of the jury. *Pool*, 715 S.W.2d at 635. The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Jones v. Tarrant Util. Co.*, 638 S.W.2d 862, 866 (Tex.1982).

*Legal Sufficiency of the Evidence
on Contributory Negligence*

█ In Andrews's first issue, he contends that there was no probative evidence to support the jury's finding of contributory negligence on his part. We disagree.

█ Contributory negligence contemplates an injured person's failure to use ordinary care in regard to his or her own safety. This affirmative defense requires proof that the plaintiff was negligent and that the plaintiff's negligence proximately caused his or her injuries. *Kroger Co. v. Keng*, 23 S.W.3d 347, 351 (Tex.2000); *Ned v. E.J. Turner & Co.*, 11 S.W.3d 407, 408 (Tex.App.-Houston [1st Dist.] 2000, pet. denied).

Andrews testified that he had worked as an electrician for numerous companies, holds a journeyman's license from the State,[1] had experience working on scaffolds, and had been on regular scaffolds many times in the past. Andrews described a regular scaffold as being a permanent fixture until it is torn down, and he pointed out how a Baker scaffold is different from a regular scaffold:

> A Baker scaffold is—or a painter's scaffold, . . . is narrow, say, six feet long, and is mobile, it has wheels on it, and you move [it] from place to place.

Andrews had assembled a Baker scaffold before and had used the scaffold; however, it was not a stacked scaffold. Andrews said that the Baker scaffold he used when he was injured consisted of two separate scaffolds and that he and his coworker stacked them on top of each other.

John Beadles, an acting labor foreman for DT Construction that day, described the Baker scaffold as a narrow scaffolding that was designed to be extended not more than four to five feet high and to hold no more than one person at a time. John Beadles said Andrews had stacked two separate Baker scaffolds to give him an extension of eight to ten feet.

Andrews testified that he knew the scaffold had been properly put together because "[i]t's pretty much common sense. The scaffold went together one way. There was no other way to put it together." He said that he made sure that the pins were inserted and the bolts were locked to keep the two scaffolds together. He acknowledged that Mike Makalic, Brien Call Electric's foreman, told him how to stack the two scaffolds. Andrews did not ask Makalic to check the assembled scaffolding because it could only be put together one way.

In describing the accident, Andrews said that he was climbing down and the scaffold fell over. John Beadles testified that the pins that locked the two scaffolds had not been inserted properly to secure the two scaffolds together because, after the accident, he saw that one of the braces had come apart and "the key to lock the scaffolding in place was laying [sic] on the floor unattached." Andrews thought that the locking pin for that brace may have fallen out after the scaffold crashed to the ground because "[t]he scaffold hit hard." Andrews believed that he put the pins in correctly when he put the scaffolding together.

Andrews agreed that Brien Call Electric was the one responsible for providing him with the proper equipment and safety items. Andrews also admitted that he had seen safety films, attended safety meetings, and had safety training at various companies where he had worked. Andrews also agreed that everyone has the responsibility to watch out for hazards on

---

1. Andrews stated that a journeyman electrician has to have had at least 8,000 hours of on-the-job training under the supervision of a master electrician and pass an examination.

the job. He had learned from experience that, before starting an activity on the job site, one should look around for obvious dangers. He also had enough experience with scaffolding that he knew how to check the scaffold to see if it was stable and secure—that was common sense. Andrews could not think of anything that DT Construction did wrong except "have had better safety personnel or [a safety] director." Andrews admitted that no one at DT Construction had ever told him how to do his job or supervised his work.

Andrews testified that he believed that, if the scaffold had had outriggers or stabilizers, he would not have fallen. He pointed out that outriggers are used to keep the Baker scaffold from tipping over.

Robert Bennett was the only superintendent for DT Construction on that day; the head superintendent, Patrick Andrew Beadles, was on vacation. John Beadles testified that, shortly after the accident, Bennett asked him to take pictures of the fallen scaffold. The pictures were introduced into evidence and showed an extremely narrow, tall scaffold on wheels. At the request of DT Construction's president, John Beadles put in a written statement what he remembered about the accident. He stated in part:

> I did not see the actual accident but was a witness to the commotion and I took pictures of the scene after the accident occurred. As I arrived on the scene I witnessed that the scaffolding, being used by Mr. Andrews, was overturned on the floor with one of the braces unsecured. I knew that the scaffolding had been unsecured before anyone got on it because the key to lock the scaffolding in place was laying [sic] on the floor unattached.
>
> After reviewing the accident scene it appears that Mr. Andrews was using the scaffolding improperly. The scaffolding

that was being used is called Bakers Scaffold. It's a narrow scaffolding that is designed to be extended no more than 4 to 5 feet and to hold no more than one person at a time. Mr. Andrews had taken two separate Bakers Scaffolds and stacked them on top of each other, without proper bracing, to allow him to have an extension of 8 to 10 feet. In addition to his own weight he allowed another Brien Call Electric employee to get on the unsecured scaffolding with him.

> In my opinion, the increased weight along with the unsecured bracing caused the scaffolding to become unstable and eventually collapse. I feel that this accident occurred due to the negligence of Mr. Andrews.

John Beadles acknowledged at trial that he really did not know why the scaffold fell. He agreed that, if he had seen the scaffold the day before, he would have tried to stop the unsafe use of the scaffold. Beadles said that the band hall was a big area with two parts and that, even if he had walked through the band hall, he might not have seen the scaffold. The construction site covered three city blocks.

Brien Call of Brien Call Electric also testified. He stated that Brien Call Electric had done several jobs for DT Construction of a similar nature, although not as large. Mike Makalic was his foreman on the job and was in charge of sixteen to twenty employees at the site. Brien Call was a master electrician and would visit the site once or twice a week to inspect the job. Although Brien Call also had a job as a flight attendant with Continental Airlines, he spoke with Patrick Beadles on a daily basis concerning the job and its progress.

Brien Call stated that he hired the electricians as subcontractors to Brien Call Electric. He testified that safety was the individual electrician's responsibility just

as his safety was his responsibility and not DT Construction's responsibility. The electricians would use equipment rented by Brien Call Electric. The electricians were required to have certain tools of their own such as tall ladders and drills, but he supplied other tools the men used. Brien Call stated more than once that safety was Andrews's responsibility.

Don Thompson, president of DT Construction, testified that a Baker scaffold is not made to be stacked but that, if "it is stacked[,] it has to have outriggers." Thompson described a Baker scaffold as being only eighteen inches to twenty-four inches wide and eight feet long, usually with an aluminum walk board. He stated that it should not go over six feet in height without a device on the bottom that extends the legs out three feet on each side to make a more stable platform. He contrasted the Baker scaffold with the normal scaffold "that is four or five foot deep [wide]." Thompson testified that it would be obvious that someone should not stack Baker scaffolds without widening the base because "common sense tells you that you don't get on something that's sixteen, eighteen foot in the air with a two foot base and rollers on it." Thompson also testified that he had been told by another subcontractor, a Mr. Macallis, that the scaffolding looked unsafe and that Mr. Macallis had offered to let them use a motorized scissor lift. Thompson believed that, under the subcontract, Andrews was responsible for his own safety.

Andrews called John Beadles as a witness at the trial. Yet Andrews now argues that the testimony and statement of John Beadles should be ignored as being no evidence of probative value. He first argues that John Beadles "merely assumed that Mr. Andrews failed to assemble the scaffold correctly." Our view is that John Beadles drew a reasonable inference—that

Andrews had not properly locked the two scaffolds together—from seeing the key to lock the scaffolding in place lying on the floor unattached. The jury could have drawn the same inference. But the most obvious and reasonable inference is that the scaffold simply tipped over because of the shifting weights of Andrews and his coworker, regardless of when the one brace came apart.

■ Andrews argues that John Beadles was not qualified to offer his opinion that "the increased weight [of Andrews and the coworker] along with the unsecured bracing caused the scaffolding to become unstable and eventually collapse." Beadles only stated what any layman might state given the obvious unstable nature of the scaffold. Andrews is correct that the determination of whether expert testimony was necessary is a question of law and is reviewed de novo on appeal. *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84 (Tex.2004).

■ Expert testimony is necessary only when the alleged negligence is of such a nature as not to be within the experience of the layman. *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 355 (Tex.1987) (holding that the "jurors had sufficient knowledge" without expert testimony because the standard was within the common knowledge of laymen); *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex.1982). In his opening statement, Andrews's counsel stated that the scaffold simply tipped over when Andrews started climbing down. Andrews testified to that fact. Expert testimony was not required to support a conclusion by the jury that the scaffold tipped over because of Andrews's actions and weight shifts in climbing down or the shifting weights of two people moving about on the scaffold or that Andrews's actions and weight shifts caused one of the four braces to come apart and the scaffold then tipped

over. The essential point is that the scaffold would not have tipped over but for the actions of Andrews. There was uncontradicted testimony by John Beadles that only one person should be on a Baker scaffold. The jury could see from the pictures (and heard from Thompson, John Beadles, and Andrews) that outriggers were needed because the scaffold was tall and narrow and that it was obvious to anyone that the scaffold could easily tip over unless something like outriggers were used to widen the base. The jury heard testimony from Thompson that another contractor told them that the scaffold looked unsafe and offered to let them use a motorized scissor lift. They refused his offer.

Andrews relies on *Ned*, 11 S.W.3d 407, in arguing that there was no evidence in the record to justify the jury's finding that Andrews was negligent. We find that *Ned* is distinguishable. The Houston court found that there was no evidence to show that any of Ned's acts were either a cause in fact of the accident or that the accident was foreseeable as a result of anything he did. The Houston court pointed out that Salazar, a front end loader operator for E.J. Turner and Company, positioned the bucket under the sandblaster, lifted it, and began to move it in the loader bucket. As Salazar was moving it, the sandblaster fell out and struck Ned.

In analyzing contributory negligence in our case, there were only the acts of Andrews to be considered. Andrews put the stacked Baker scaffold together, considered the assembly to be a matter of common sense, inserted the pin to lock the scaffolds, was warned by another subcontractor that the scaffolding looked unsafe, was offered use of a motorized scissor lift, and tipped the scaffold over by climbing down. Most significantly, there was substantial testimony that any reasonable person would see that the Baker scaffold—due to its narrow width, height, and rollers—was obviously unstable unless it had some type of bracing such as outriggers. Andrews presented no evidence of another hypothesis as to why the scaffold tipped over.

■ The standards and tests for determining whether a plaintiff's conduct constituted contributory negligence are the same as those by which the negligence of a defendant is determined, and the rules of law applied to contributory negligence are the same as those applied to primary negligence. *Carney v. Roberts Inv. Co.*, 837 S.W.2d 206, 208 (Tex.App.-Tyler 1992, writ denied). The evidence was legally sufficient to support the jury's finding of contributory negligence on the part of Andrews. We overrule appellant's first issue.

*Legal and Factual Sufficiency of the Evidence on Proportionate Responsibility*

Under TEX. CIV. PRAC. & REM.CODE ANN. § 33.001 (Vernon 1997), Andrews recovered no damages because the jury found his percentage of responsibility for his injuries was greater than fifty percent. We turn first to the jury's finding that DT Construction was twenty-five percent responsible for Andrews's injuries.

■ To impose liability on DT Construction, DT Construction must have owed a duty to Andrews and breached that duty, and that breach must have caused Andrews's injury. Andrews had been working on the scaffold while installing electrical wiring in the ceiling of the school's band hall. The ceiling was fourteen feet high from the finished concrete floor to the bar joint. Appellant was injured while attempting to climb down from the scaffold that he had assembled and that was furnished by Brien Call Electric. It is undisputed that no one from DT

Construction had anything to do with the scaffold or even saw the scaffold before the accident.

■■■■ Generally, a premises owner or general contractor does not have a duty to ensure that an independent contractor safely performs his work.[2] *Lee Lewis Const., Inc. v. Harrison,* 70 S.W.3d 778, 783 (Tex.2001); *Abalos v. Oil Dev. Co. of Tex.,* 544 S.W.2d 627 (Tex.1976). But the court in *Redinger v. Living, Inc.,* 689 S.W.2d 415, 418 (Tex.1985), adopted the limited-duty rule set forth in Section 414 of the Restatement (Second) of Torts that, when the premises owner or general contractor retains some control over the independent contractor's work, it must exercise that control with reasonable care. *Koch Ref. Co. v. Chapa,* 11 S.W.3d 153, 155 (Tex.1999); RESTATEMENT (SECOND) OF TORTS § 414 (1965). A general contractor can retain the right to control an aspect of an independent contractor's work or project so as to give rise to a duty of care to that independent contractor's employees either by contract or by actual exercise of control. *Lee Lewis,* 70 S.W.3d at 783. To examine DT Construction's "retained control" in analyzing whether it owed a duty to Andrews, we begin with a review of the construction contract and subcontracts. *See, e.g., Dow Chem. Co. v. Bright,* 89 S.W.3d 602 (Tex.2002); *Lee Lewis,* 70 S.W.3d at 788–90.

The contracts in this case appear to be similar to those in *Lee Lewis.* Just as in *Lee Lewis,* the contract between Sheldon Independent School District and the general contractor, DT Construction, was a standard form of The American Institute of Architects. This one was entitled "Standard Form of Agreement Between Owner and Contractor where the basis of payment is a Stipulated Sum" (AIA Docu-

ment A101)(the Contract). As between Sheldon ISD and DT Construction, Articles 3.3.1 and 3.3.2 set forth the supervision and construction responsibilities of the general contractor:

3.3.1 The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless Contract Documents give other specific instructions concerning these matters.

3.3.2 The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons performing portions of the Work under a contract with the Contractor.

In Article 10.2, DT Construction agreed to take reasonable precautions for the safety of employees on the work. In Article 5.3.1, Sheldon ISD required DT Construction to require each of its sub-contractors to be bound to DT Construction as general contractor by the terms of the Contract and "to assume toward the Contractor all the obligations and responsibilities which the Contractor ... assumes toward the Owner and Architect."

In Paragraph 4(a) of its subcontract, Brien Call Electric agreed to be bound by the terms of the Contract and "expressly assume[d] toward Contractor [DT Construction] the same obligations of any indemnity or hold harmless agreement which Contractor has had to assume toward Owner." Thus, as between DT Construction and Brien Call Electric, Brien

---

2. A general contractor in control of the premises is charged with the same duty as an owner or occupier. *Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 527 (Tex.1997).

Call Electric agreed to be "solely responsible for and have control over construction means, methods, techniques, sequences and procedures" relating to the work agreed to in its subcontract; to be responsible for the acts and omissions of its employees;[3] and to take reasonable precautions for the safety of its employees.

In Paragraph 8, Brien Call Electric agreed to "at all times supply adequate tools, appliances and equipment, a sufficient number of properly qualified workmen and a sufficient amount of materials and supplies of proper quality to prosecute said work efficiently." Brien Call Electric also agreed in Paragraph 22 to "require his employees, on this project, to attend brief safety meetings that will be called by the contractor or his representative. . . . [A]nd his employees shall abide by all safety regulations . . . of the Contractor or his representative." Thus, as in *Lee Lewis*, DT Construction required its subcontractors to agree to adhere to safety rules and attend safety meetings. Although Brien Call Electric agreed to be responsible for the safety of its own workers, DT Construction had the right to monitor its efforts and did so. Here, as Justice Hecht pointed out in his concurring opinion in *Lee Lewis*, "the general contractor had thorough control of safety on the site, which is typical for major construction projects." *Lee Lewis*, 70 S.W.3d at 788.

The Texas Supreme Court has stated that safety requirements, such as DT Construction imposed on its subcontractors, give rise to at most "a *narrow* duty of care." *Hoechst–Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357 (Tex.1998). The supreme court in *Mendez* cited *Tovar v. Amarillo Oil Co.*, 692 S.W.2d 469, 470 (Tex.1985), where it held that an oil company breached a duty of care to a drilling contractor employee by not exercising its contractual right to suspend drilling operations after it learned that the drilling contractor was violating a specific critical safety provision in the drilling contract. We note that the court in *Lee Lewis* also imposed liability on the general contractor because the general contractor knew of a dangerous condition before the injury occurred and approved acts of the subcontractor that were unsafe. Here, it is conceded that DT Construction did not know about the scaffold, and there is no evidence that Brien Call Electric had been engaged in unsafe practices.

The Texas Supreme Court has also emphasized that, for the general contractor to be liable for negligence, its supervisory control must relate to the condition or activity that caused the injury. *Mendez*, 967 S.W.2d at 357; *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 528 (Tex.1997). Under the subcontract, DT Construction did not have control over how the electrical work was done by Brien Call Electric. Thompson and company supervisor, Patrick Beadles, testified to that same effect. As Patrick Beadles put it, general contractors hire electricians because they are specialized in that area. Andrews acknowledged that no one from DT Construction attempted to tell him how to do his job or supervised his work. DT Construction did not have supervisory control over the manner and means of the activity that caused the injury—the installation of electrical wiring.

Because it is undisputed that DT Construction did not know about the scaffold before the injury occurred and did not approve any acts that were dangerous and

---

3. Although Brien Call referred to his electricians as independent contractors, we have referred to them as employees because Brien Call Electric had control over the manner and means of their work and supervised them.

unsafe, Andrews relies on the retention of control reflected in the Contract with Sheldon ISD and argues that those provisions imposed a duty on DT Construction to make the workplace safe for Andrews. Andrews argues that he was a beneficiary of the Contract between Sheldon ISD and DT Construction where DT Construction agreed to be responsible for the manner and means of construction. This argument fails because DT Construction then contracted with its subcontractors for the subcontractors to be responsible for the manner and means of accomplishing the work required in their subcontracts. The provisions in the Contract merely required DT Construction to take responsibility for any claims against Sheldon ISD arising out of the actions of DT Construction or its subcontractors. *See Elliott–Williams Co. v. Diaz,* 9 S.W.3d 801, 804–05 (Tex.1999). Our focus is on the subcontract.

Although DT Construction has not disputed that it retained control over safety, DT Construction argues that there was no evidence that it was negligent despite the jury's finding that it was 25% negligent. DT Construction is correct. First, there was no evidence that DT Construction had anything to do with the scaffold or even knew about it. Second, Andrews presented no expert testimony on what a reasonably prudent general contractor would have done under the same or similar circumstances. Third, and perhaps most important, DT Construction did not owe a duty to Andrews under the circumstances of this case. *See Bright,* 89 S.W.3d 602; *Koch Ref. Co.,* 11 S.W.3d 153. DT Construction did not have the right to control the means, methods, or details of the independent contractor's work. *Bright,* 89 S.W.3d at 606–07.

Requiring its subcontractor, Brien Call Electric, to observe and promote compliance with general safety guidelines and other standard safety precautions did not impose an unqualified duty of care on DT Construction to ensure that the independent contractor's employees did nothing unsafe. *See Koch Ref. Co.,* 11 S.W.3d 153. Requiring its subcontractors to have their employees learn and follow general safety procedures subjected DT Construction to only a narrow duty to make certain that its safety requirements and procedures did not unreasonably increase the probability and severity of injury. *Bright,* 89 S.W.3d at 607. The subcontractor, Brien Call Electric, was in a better position to inspect, eliminate, or warn Andrews of the danger arising from its work than DT Construction. *See Shell Chem. Co. v. Lamb,* 493 S.W.2d 742, 746–48 (Tex.1973). Under the facts of this case, the mere contractual retention of control over safety on a construction site was not sufficient to impose liability on the general contractor when the independent contractor's employee was injured.

We recognize that the jury found that DT Construction had "a right to control the use of the scaffold" by Andrews (implying that DT Construction breached a duty to Andrews) and was 25% responsible for Andrews's injury. DT Construction has not argued that it owed no duty to Andrews. DT Construction did challenge the jury's finding of negligence on its part, and there can be no negligence if there is no duty. The question of duty is a matter of law. *Caterpillar, Inc. v. Shears,* 911 S.W.2d 379 (Tex.1995). The trial court's judgment should be affirmed on the basis that DT Construction owed no duty to Andrews. But, even assuming DT Construction had some limited duty, we find that the jury's allocation of proportionate responsibility was not against the great weight and preponderance of the evidence nor was it manifestly unjust. We overrule appellant's second issue.

*This Court's Ruling*

The judgment of the trial court is affirmed.