

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00429-CR

———————————————

WILLIAM BRUCE GLEASON, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 271st District Court
Jack County, Texas
Trial Court No. 4815

Before Bassel and Womack, JJ.; Lee Ann Dauphinot (Senior Justice,
Retired, Sitting by Assignment).
Memorandum Opinion by Justice Dauphinot

**MEMORANDUM OPINION**

The trial court convicted Appellant William Bruce Gleason of felony driving while intoxicated (DWI), enhanced by a prior felony DWI conviction, and sentenced him to seven years' confinement in the Institutional Division of the Texas Department of Criminal Justice. Appellant brings a single point on appeal, arguing that the trial court abused its discretion in denying his motion to suppress evidence seized from his illegal traffic stop. He does not challenge the sufficiency of the evidence to support his conviction. Because the trial court committed no reversible error in denying Appellant's motion to suppress the evidence complained of, we affirm the trial court's judgment.

Brief Facts

Tracie Pippin, the Jack County District Clerk, grew up in Jack County and personally knew Appellant. On June 30, 2017, Pippin saw Appellant at a local funeral home visitation. She spoke to Appellant there and noticed the smell of alcohol that she thought came from his breath. Appellant was also unsteady. Out of concern, she asked Appellant to step outside, where she offered to give him a ride home. He declined the offer.

At the same time, Jack County Sheriff Tom Spurlock was also in the lobby of the funeral home to provide security during a visitation. He testified that he noticed Appellant in the lobby and became suspicious that Appellant might be intoxicated because he was unsteady on his feet, he stumbled, and his voice was loud and slurred.

Sheriff Spurlock also testified that Appellant appeared to avoid him, walking further down the hallway and "peeking around the corner" at him. One of the family members at the funeral home expressed concern to Sheriff Spurlock that Appellant was intoxicated.

Jack County Deputy Jack Randall Hunter arrived at the funeral home to issue a criminal-trespass warning unrelated to this case. Sheriff Spurlock told Deputy Hunter to "keep an eye" on Appellant. According to Sheriff Spurlock, he also told Deputy Hunter "what [Appellant's] actions had been like since [Sheriff Spurlock] had seen him come in." But Deputy Hunter testified that Sheriff Spurlock told him only that he thought Appellant appeared to be intoxicated.

While Sheriff Spurlock and Deputy Hunter were occupied with the person receiving the criminal-trespass warning, Appellant got into his pickup and started to back out. Deputy Hunter did not see Appellant getting in his truck, but he did see the truck leaving the funeral-home parking lot. He followed Appellant until Appellant stopped in the parking lot at the VFW.

Deputy Hunter described the route Appellant took, referencing street names and landmarks in detail, but he did not say how long it took for him to follow Appellant to the VFW. Deputy Hunter testified that he did not see any instances of impaired driving by Appellant while he was following him. Indeed, although Deputy Hunter's unit was equipped with a functioning dash camera, he did not activate the

camera until after both he and Appellant had already pulled into the parking lot and stopped.

Deputy Hunter testified that he stopped behind Appellant and then walked up to the driver's side of Appellant's truck. When asked what Appellant did then, Deputy Hunter said, "Well, I announced -- told him who I was and what was going on. He seemed a little confused, a little -- I don't know what the word -- maybe a little incoherent about who I was and where we were and what was going on." According to Deputy Hunter, when the truck's door opened, he "could smell the odor of alcoholic beverage from inside there."

Deputy Hunter testified further that Appellant's eyes were "a little red at the time from looking -- when I looked at him there." Deputy Hunter asked Appellant to "step out of the truck and come to the back of his vehicle to visit with [him]." He described Appellant's exiting the truck as follows:

> After several times of asking him and kind of coaching him come on back here in the back, he did. He did make his way to the back of the truck.
>
> . . . .
>
> His balance seemed off. He was -- he was having a difficult time walking back. He actually used the bed rail of the truck to hold on to as he was walking, and he stopped a little bit. And I asked him to come back here to the back of the truck with me, and he finally made it there but he did -- didn't have his balance with him at all there that day.

Deputy Hunter then testified he performed the horizontal gaze nystagmus (HGN) field sobriety test on Appellant and that he observed lack of smooth tracking

4

on both eyes and nystagmus onset prior to 45 degrees.  After the HGN test, Deputy Hunter asked Appellant to perform the one-leg-stand.  Deputy Hunter testified that Appellant did not attempt that test; he told Deputy Hunter he could not perform it because of a prior knee surgery and nerve damage in his feet.  Deputy Hunter testified that on the walk-and-turn test, Appellant started early before Deputy Hunter had completed the instructions and also stepped off the line a few times.  Deputy Hunter concluded it was "unsafe" for Appellant to continue performing the test.  Deputy Hunter testified that he also had Appellant perform two additional, nonstandardized sobriety tests and that after his interaction with Appellant, he believed Appellant was intoxicated by the introduction of alcohol into his body.

Instead of performing the tests within view of the patrol car's dash camera, Deputy Hunter asked Appellant "to [go] out [to] the roadway that was a little more smooth and more level . . . to perform . . . testing."  According to Deputy Hunter, he did not think to move the dash camera at the time.

Although we cannot see Appellant's performance on the field sobriety tests, we can hear what was said on the video.  We have only a narrative of Deputy Hunter's commentary on what he contends is Appellant's performance.  Deputy Hunter does explain on the video, however, that Appellant claimed he was recovering from knee surgery, had nerve damage in his feet, and could not perform the one-leg stand.

After Appellant had been taken into custody, and the officers were no longer outside their vehicles, the dash camera was shifted to record the area where the field

5

sobriety tests had been conducted. No one contends the camera was incapable of recording the field sobriety tests.

Trevor Wilson Topper, a Texas Department of Public Safety trooper and certified intoxilyzer operator, was requested to obtain a breath sample from Appellant. But when Trooper Topper arrived at the jail, Appellant declined to provide a breath sample to be tested.

Appellant was later charged with felony DWI. The indictment alleged, in pertinent part, that Appellant did

> then and there operate a motor vehicle in a public place while [he] was intoxicated by not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, or a combination of two or more of those substances into the body, or by having an alcohol concentration of at least 0.08.

Before testimony began at his trial, Appellant entered into a stipulation regarding his two prior jurisdictional DWI convictions. The State also waived the deadly-weapon allegation it had included in the indictment.

The trial court found Appellant guilty of felony DWI. Appellant then entered a plea of true to the enhancement paragraph, and following a brief punishment hearing, the court sentenced him to seven years' confinement.

## We Correct a Clerical Error in the Trial Court's Judgment

Before considering the appeal's merits, we must correct an obvious clerical error in the trial court's judgment. The case now before this court was tried to the judge, who found Appellant guilty of felony DWI and the enhancement allegations

6

true. The court entered a verdict of guilty of felony DWI as alleged in the indictment. We note the judgment incorrectly reflects that a jury returned the verdict of guilty. Therefore, the judgment contains a clerical error.[1]

When the record provides the necessary information to correct a clerical error in the trial court's judgment, we may modify the judgment to speak the truth.[2] Therefore, we correct the clerical error in the judgment to reflect that the judge, not a jury, heard the case and returned the guilty verdict.

Motion to Suppress

Appellant does not challenge the sufficiency of the evidence to support his conviction for DWI. Rather, he challenges only the trial court's denial of his motion to suppress the evidence obtained after what he argues was an illegal traffic stop.

Standard of Review

We review a trial court's ruling on a motion to suppress for an abuse of discretion.[3] We view the evidence in the light most favorable to the trial court's ruling, and we will reverse only if the ruling is arbitrary, unreasonable, or "outside the

---

[1]*See Ex parte Poe*, 751 S.W.2d 873, 876 (Tex. Crim. App. 1988) ("A clerical error is [an error that] does not result from judicial reasoning or determination."); *Cain v. State*, 621 S.W.3d 75, 88 (Tex. App.—Fort Worth 2021, pet. ref'd).

[2]*French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Cain*, 621 S.W.3d at 88.

[3]*State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018).

zone of reasonable disagreement."[4]  Because the trial court is the sole trier of fact at a suppression hearing, we give almost total deference to the trial court's determinations of historical facts, especially when those determinations are based on assessments of credibility and demeanor.[5]  The trial court is entitled to believe or disbelieve all or any part of a witness's testimony, whether that testimony is controverted or uncontroverted, because the court has the opportunity to observe the witness's demeanor and appearance.[6]  This deferential standard of review also applies to a trial court's determination of historical facts based on a videotape recording admitted into evidence at a suppression hearing, although we may review de novo "'indisputable visual evidence' contained in a videotape."[7]

If the trial court makes express findings of fact, we view the evidence in the light most favorable to its ruling and determine whether evidence supports the fact

---

[4]*State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)).

[5]*Ramirez-Tamayo v. State*, 537 S.W.3d 29, 35 (Tex. Crim. App. 2017); *Story*, 445 S.W.3d at 732; *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010) ("The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.").

[6]*Valtierra*, 310 S.W.3d at 447.

[7]*State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013) (quoting *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000)); *State v. Fikes*, 585 S.W.3d 636, 641 (Tex. App.—Austin 2019, no pet.).

findings.[8]  If the trial court does not make express findings, we still view the evidence in the light most favorable to the ruling, and we assume that the trial court made implied findings of fact that support its ruling as long as those findings are supported by the record.[9]  Here, the trial court did not make express findings of fact.

We review de novo the trial court's application of the law to facts that do not turn on credibility and demeanor.[10]  "[A] question 'turns' on an evaluation of credibility and demeanor 'when the testimony of one or more witnesses, if believed, is *always* enough to add up to what is needed to decide the substantive issue.'"[11]  We will uphold the trial court's ruling if it is correct under any theory of applicable law.[12]

Applicable Fourth Amendment Law

In determining whether a search or seizure is reasonable, we must know what type of encounter the defendant had with the police:  a consensual encounter, investigatory detention, or arrest.[13]  Both investigative detentions—most commonly,

---

[8]*Valtierra*, 310 S.W.3d at 447.

[9]*Ramirez-Tamayo*, 537 S.W.3d at 35–36 (quoting *Harrison v. State*, 205 S.W.3d 549, 552 (Tex. Crim. App. 2006)).

[10]*Story*, 445 S.W.3d at 732.

[11]*Abney v. State*, 394 S.W.3d 542, 547 (Tex. Crim. App. 2013) (quoting *Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998)).

[12]*Cortez*, 543 S.W.3d at 203.

[13]*See State v. Woodard*, 341 S.W.3d 404, 410–11 (Tex. Crim. App. 2011).

*Terry* stops—and arrests are restraints on a person's freedom, but an arrest involves the greater degree of restraint.[14]

To determine whether an encounter is an investigative detention or an arrest, Texas courts examine the totality of the circumstances from an objective viewpoint on an ad hoc basis.[15] Generally, a detention that seems to be something more than would be necessary to simply safeguard the officers and assure the suspect's presence during an investigatory period is an arrest.[16] The primary question in determining whether a person has been detained to the degree associated with an arrest is whether a reasonable innocent person would perceive the detention to be a restraint on movement comparable to a formal arrest, under all of the objective circumstances.[17] A person may be arrested—in custody, necessitating *Miranda* and Article 38.22 warnings—when the person is physically deprived of his freedom of action in any

---

[14]*State v. Sheppard*, 271 S.W.3d 281, 290 (Tex. Crim. App. 2008); *Melton v. State*, 790 S.W.2d 322, 326 (Tex. Crim. App. 1990); *White v. State*, 395 S.W.3d 828, 834 (Tex. App.—Fort Worth 2013, no pet.).

[15]*Curtis v. State*, 238 S.W.3d 376, 379 (Tex. Crim. App. 2007).

[16]*Sheppard*, 271 S.W.3d at 291.

[17]*Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528–29 (1994); *Florida v. Bostick*, 501 U.S. 429, 436, 438, 111 S. Ct. 2382, 2387–88 (1991); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).

significant way or when an officer creates a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted.[18]

As to the validity of an arrest, the law is well established that

> [a] police officer may arrest an individual without a warrant only if probable cause exists with respect to the individual in question, and the arrest falls within one of the exceptions set out in the Code of Criminal Procedure. Probable cause for a warrantless arrest under article 14.01(b) may be based on an officer's prior knowledge and personal observations, and an officer may rely on reasonably trustworthy information provided by another person in making the overall probable cause determination. "Thus, all of the information to support probable cause does not have to be within an officer's personal knowledge." "The ultimate question under Article 14.01(b) is 'whether at that moment the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrested person had committed or was committing an offense.'"[19]

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts.[20] An officer conducts a lawful temporary detention when he reasonably suspects that an individual is violating the law.[21] Reasonable suspicion

---

[18]*See Dowthitt*, 931 S.W.2d at 255.

[19]*State v. Martinez*, 569 S.W.3d 621, 628 (Tex. Crim. App. 2019) (citations omitted) (quoting *Woodard*, 341 S.W.3d at 412).

[20]*Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); *Carmouche*, 10 S.W.3d at 328.

[21]*Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity.[22]  This is an objective standard that disregards the detaining officer's subjective intent and looks solely to whether the officer has an objective basis for the stop.[23]  The facts relied on to support reasonable suspicion must amount to more than a general suspicion or hunch.[24]

<u>Analysis</u>

<u>Pretrial Evidence</u>

Appellant contends that the "traffic stop" was illegal because "[a]ccording to his affidavit to support the detention[,] the law enforcement officer affiant did not identify specific, articulable facts to justify detaining Appellant."

The first page of the affidavit is included in the clerk's record as part of Defendant's Pretrial Exhibit 1, an attachment to his pretrial motion to suppress.  The remainder of the affidavit is missing from the clerk's record, but page 3 of the exhibit contains a "Probable Cause Determination," signed by a magistrate, that after the warrantless arrest, "[s]ufficient facts have been presented to [the magistrate] under

---

[22]*Ford*, 158 S.W.3d at 492.

[23]*Id.*

[24]*Hernandez v. State*, 376 S.W.3d 863, 869 (Tex. App.—Fort Worth 2012, no pet.) (per curiam).

12

oath by affidavit, sworn testimony, or other[]wise to show that probable cause existed for the continued detention of [Appellant] as to the following charges:  Driving While Intoxicated 3rd or More."  The State attached to its response to the motion an affidavit from Sheriff Spurlock.  Although it appears the trial court did not hold a hearing on Appellant's pretrial motion to suppress, the parties also consensually relitigated the motion at trial; therefore, we review not only the affidavits but also the facts adduced at trial.[25]

The part of Deputy Hunter's affidavit attached to Appellant's motion to suppress reads as follows:

> On 06-30-17 this Deputy was at Coker Funeral Home to serve a criminal trespass notice to an individual.  While waiting to serve notice I was informed that the driver of the maroon Chevy Colorado pick-up truck parked in the north lot was intoxicated; if I saw him in the area I should check on him and see if he was a danger to himself or others.  This subject was described as a white male, wearing a blue shirt and blue shorts with a ball cap on.  After serving the notice I was standing outside with Sheriff Spurlock looking to see if the subject had left [t]he building and was outside.  While looking for the subject I noticed the described truck driving out of the parking lot onto Hwy[.] 148.  I left the Sheriff and went to my truck to try and stop the vehicle.  I noticed that the truck had turned onto Hwy. 281 and was southbound toward Jacksboro.  I got into my truck and radioed officers with Jacksboro Police Department; I advised what the situation was, a description of the vehicle and last known direction of travel.  I got onto Hwy. 281 and drove south.  I saw that the vehicle had turned onto Oakwood Avenue and continued north then east.  I followed and saw the vehicle on Oakwood Ave and turn south onto Jack Street.  As I turned onto Jack Street I saw the vehicle in the east parking lot of the VFW.  I pulled in behind the vehicle and noticed that there was one occupant inside the vehicle in the driver seat, all doors to the vehicle were closed[,] and no

---

[25] *See Black v. State*, 362 S.W.3d 626, 635–36 (Tex. Crim. App. 2012).

one was walking or standing in the parking area. I notified the Sheriff's Office dispatch that I would be out with that vehicle at that location and I approached the vehicle on its driver's side. As I approached, I could see that the sole occupant of the vehicle was watching me in the side rearview mirror. He opened the driver['s] door[;] I announced myself and asked him to step out of the vehicle and talk with me. I had to ask him several times to walk to the rear of the vehicle to visit with me[.] [O]nce at the rear of the vehicle[,] I could smell an odor of alcoholic beverage emitting from his person. I advised him of the reason I was there and asked him if he had been drinking. He stated that he had taken Carrie to the beer store and dropped her off at the funeral home, and then he came here. I advised him that I had been notified that he was at the funeral home and that he may be intoxicated[.] I explained to him that I had been looking and noticed his vehicle leaving the area. I asked him if he would mind stepping to a more level spot in the area to conduct a few tests to determine if he was too intoxicated to be driving. He followed me to the level area. I asked him to remove his hat and glasse[s] and keep his feet together and hands to his side. I conducted a Horizontal Gaze Nystagmus test on him[;] he had several clues displayed. I then started to explain the next test I was going to have him attempt[;] as I was explaining, he interrupted me and advised he knew what I was going to ask him to do but he would not be able to do it because he had had surgery on his left knee and he also had diabetic nerve pain in his feet. I advised him we would attempt another test. I was trying to explain and demonstrate what I needed him to do[;] while demonstrating he was attempting to follow the[.]

Sheriff Spurlock's affidavit was much shorter:

On Friday, 06302017, your affiant was attending a visitation at Coker's Funeral Home, located at the corner of Highway 148 and North Main, Highway 281, in Jacksboro, Texas, for security purposes due to a family conflict. While seated in the lobby your affiant observed a white male speaking to various people attending the visitation. The white male was later identified as [Appellant] . . . . [Appellant] was wearing a blue shirt and blue shorts with a ball cap and appeared to be intoxicated by being very unsteady [in his] gait and walk to the point he was stumbling. [Appellant's] eyes appeared to be glassy. One of the people attending the services approached your affiant and asked him if he had observed [Appellant]. This person stated that [Appellant's] intoxication was typical as [Appellant] was always "drunk". While observing [Appellant],

14

Deputy Randy Hunter came into the funeral home to serve a Criminal Trespass Warning on an individual that was at the visitation. I pointed out [Appellant] to Hunter and advised him that [Appellant] appeared to be intoxicated. It was also determined that [Appellant] had arrived at the funeral home in a maroon Chevrolet Colorado pickup truck and that it was parked on the north side of the building. The person that Hunter was there to serve the Criminal Trespass Warning [on] came into the lobby and Hunter had her step into the office where he could complete the warning. While this took place, [Appellant] went out the front door and went to the pickup unnoticed by your affiant or Hunter. When we noticed that he was no longer in the building, Hunter and Spurlock went outside and Hunter saw that [Appellant] was driving out of the parking lot on Highway 148. Hunter then got back into his patrol unit and proceeded to catch up with [Appellant]. Your affiant went back into the funeral home at that point.

### Not a Traffic Stop

As we understand Appellant's argument, the trial court was obligated to suppress evidence of everything that occurred after Appellant's "illegal traffic stop."[26] Deputy Hunter also refers to his encounter with Appellant as a traffic stop, and the State calls the encounter a traffic stop as well. The record, however, reflects no traffic stop.[27] Although Deputy Hunter's intent was to try to stop the vehicle Appellant was

---

[26]Appellant's brief cites *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997), for the proper test to use in determining when an officer has reasonable suspicion to justify a traffic stop. As we explain below, that test does not govern Deputy Hunter's initial interaction with Appellant at the parked truck.

[27]*See Merideth v. State*, 603 S.W.2d 872, 873 (Tex. Crim. App. [Panel Op.] 1980) (holding that there was no investigative stop when police officer approached defendant in his parked car in a parking lot and could see a marijuana cigarette in plain view); *see also, e.g.*, *Knox v. State*, No. 02-15-00305-CR, 2016 WL 3658703, at *4 (Tex. App.—Fort Worth July 7, 2016, no pet.) (mem. op., not designated for publication) (holding that officer did not detain Knox when officer approached Knox in parked car, but before officer could communicate any intent to investigate, Knox had "begun

15

driving away from the funeral home, he was unable to do so or changed his mind and decided merely to follow Appellant. The record does not enlighten us or explain why Deputy Hunter did not engage with Appellant until after Appellant had pulled into the VFW parking lot. Nor does the record explain why Deputy Hunter decided not to record Appellant's operation of the pickup before it was stopped.

Deputy Hunter conceded in response to the State's questions that he had a fully functioning camera mounted on the dash of his vehicle. Yet, he chose not to engage either the video or audio capabilities of the camera until Appellant had stopped his pickup in the parking lot. The truck Appellant was driving was already stopped and parked in the parking lot of the VFW by the time Deputy Hunter would have been in a position to stop the truck. Although there was no traffic stop, in the interest of justice, we shall address whether the detention of Appellant's person in the VFW parking lot after he parked his truck was justified, although there was no traffic stop.

Detention Justified

Appellant appears to contend that he was arrested without probable cause the moment Deputy Hunter approached the truck. However, he also challenges whether Deputy Hunter had the reasonable suspicion required to initiate and maintain a temporary detention.

to emit an odor of alcohol" and emerged from the vehicle, unsteady and with red, watery, and glazed-over droopy eyes).

16

Appellant was not detained at the funeral home or while he was driving. Nothing in the record indicates that Deputy Hunter instructed or ordered Appellant to stop his vehicle or to pull into the VFW parking lot. After Appellant parked his truck in the parking lot of the VFW, Deputy Hunter walked up to him and asked him to get out of the truck and talk to him. Deputy Hunter did not make any statement or take any physical action indicating that Appellant was not free to leave, not free to decline to speak with him, or not free to refuse any of his instructions. On the other hand, Deputy Hunter did not tell Appellant he was free to refuse to speak to him or to follow his instructions. Appellant made no effort to refuse to comply with Deputy Hunter's instructions, to refuse to answer his questions, or to walk away from Deputy Hunter into the VFW building. Thus, the initial interaction between Deputy Hunter and Appellant at the truck door was a consensual encounter.[28]

Deputy Hunter testified that when he approached the truck, Appellant seemed confused. When Appellant opened the truck door, Deputy Hunter smelled the odor of alcohol. Because Appellant declined an intoxilyzer test and no bodily fluids were analyzed, the odor is the only evidence from the interaction between Deputy Hunter and Appellant that Appellant was intoxicated by alcohol. The question of whether to believe the testimony of witnesses regarding the odor of an alcoholic beverage lies

---

[28] *See, e.g.*, *Randall v. State*, 440 S.W.3d 74, 79 (Tex. App.—Waco 2012, pet. ref'd).

squarely within the province of the trial judge.[29] The trial judge clearly found this testimony to be credible. Deputy Hunter's smelling the odor of an alcoholic beverage, along with his observation of Appellant's red eyes and confused manner, provided reasonable suspicion to detain and investigate Appellant for public intoxication.[30]

We have closely examined the portion of the dashcam video that recorded the rest of the actions and interactions Deputy Hunter described. This portion of the recording does not support all of Deputy Hunter's testimony. Although Appellant opened the truck door when Deputy Hunter approached the driver's side, he did not get out immediately. After only a short pause, though, he got out of the truck and complied with Deputy Hunter's instruction to walk to the back. Although Appellant's gait is a little slow and wide-legged, he did not appear to have a particularly difficult time walking. He did one time lean his arm against the truck's bed rail while walking to the back of the truck, but he did not appear to "hang" onto the bedrail. Most of the time during the conversation with Deputy Hunter, Appellant was standing away

---

[29] *See Ex parte Mayhugh*, 512 S.W.3d 285, 298 (Tex. Crim. App. 2016) ("[T]he fact-finder is free to believe all, part, or none of a witness's testimony.").

[30] *See* Tex. Penal Code Ann. § 49.02(a) ("A person commits an offense if the person appears in a public place while intoxicated to the degree that the person may endanger the person or another."); *see also id.* § 1.07(40) ("'Public place' means any place to which the public or a substantial group of the public has access and includes, but is not limited to, streets, highways, and the common areas of schools, hospitals, apartment houses, office buildings, transport facilities, and shops."); *Martinez*, 569 S.W.3d at 628 ("As for the element of danger, it is sufficient that the person merely rendered himself or others subject to potential danger.").

from the truck. But as the conversation went on, Appellant leaned his arm against the pickup's back bedrail. But there was no indication on the video that he was having trouble maintaining his balance at the time, he did not appear to have any particular difficulty in carrying on the conversation, and his speech did not seem particularly slurred.

After Deputy Hunter asked Appellant to step out of the range of the camera to perform field sobriety tests, Appellant hesitated. But once he started walking off-camera, Appellant indicated no particular difficulty walking through the gravel. After that, we hear only Deputy Hunter's commentary on Appellant's performance, suggesting Appellant was having trouble performing some of the tests. Deputy Hunter also noted that Appellant had recently undergone knee surgery. The testimony that Appellant could not walk without using the bed rail of the truck to hold on to as he was walking is not supported by the video. But whether this testimony is accurate is not crucial to the trial court's final determination of intoxication. The remainder of Deputy Hunter's testimony regarding evidence of Appellant's intoxication refers to field sobriety tests that, inexplicably, are performed after Appellant was instructed to move to a location not visible on the dashcam. The trial court was forced to rely only on Deputy Hunter's testimony and his running

commentary on his opinion of Appellant's ability to perform the tests. We must therefore give total deference to the trial court's determination of credibility.[31]

We have examined the entire record, including the video recording, and conclude that Deputy Hunter did not need reasonable suspicion to approach Appellant in his truck, that Deputy Hunter's observations when Appellant opened the truck door gave him reasonable suspicion to investigate Appellant for public intoxication, that Deputy Hunter's investigation did not exceed the scope of that reasonable suspicion, and that the results of the tests—as determined by the trial court—gave Deputy Hunter probable cause to arrest Appellant. Moreover, under the totality of the circumstances as determined by the trial court, Appellant was not arrested until after he had completed those portions of the field sobriety tests that Deputy Hunter administered.

Considering the record as a whole, and applying the appropriate standards of review, we hold the trial court committed no reversible error by denying Appellant's motion to suppress. We therefore overrule Appellant's sole issue on appeal and affirm the trial court's judgment.

---

[31] *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

20

<u>Conclusion</u>

Having overruled Appellant's sole issue, we affirm the trial court's judgment as modified.

/s/ Lee Ann Dauphinot

Lee Ann Dauphinot
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  September 9, 2021